Next case on our list is United States v. Diaz-Hinirio. And counsel for appellant, Mr. DuCorey Acevedo, are you on the line? Yes. Okay, welcome. And, of course, Mr. Bonner, we have here in court. Good morning to everybody. Good morning. All right. Appellant's counsel, you can proceed. Thank you. Good morning to all. My name is Federico Cozai. I'm counsel for Mr. DuCorey Diaz-Hinirio. I apologize for not being able to be there via my control, but I appreciate the opportunity to make the oral argument. Well, in this case, it has become a really interesting point for us regarding precisely the things alleged in our brief, but mainly the points regarding the rights, important rights to every citizen and, in this case, our clients. Our six different points briefed on the appeal have to do with basically basic right violations to our clients. The first one, I think, is the one that deals mostly with most of the biggest concern here, which will be that the case against our clients was based on evidence obtained through a search warrant, which in turn was the fruit of the poisonous tree. We have alleged this search warrant was obtained after an illegal entry was performed and an illegal search performed in this residence. After the police were driven there by an informant. Can you answer a question for me, please, sir? Sure thing. Sure thing. Please. Can you point us to someplace in the record where we could get an understanding of what rights, if any, your client has with respect to the property that was searched? So that we could get some understanding of why he expected privacy with respect to the police entry or against the confidential informants inviting the police in? Yes, I believe it's on the records of the suppression hearing where the owners of the property visited the property to collect their rent. And the person that was staying there at that time was Mr. Joel Diaz-Emilio. And he went to answer the door to the owners of the residence as witnessed or testified by the owners of the residence, stating that at that time Mr. Mejia was out there. Let me make sure I understand. You're saying that it's in the record of the suppression hearing that there's testimony from someone that the owners of the property... Yes, the testimony from the agent who portrayed the testimony that they interviewed the owners of the residence, which was testified that Mr. Emilio had opened the door when they went to ask for the rent on four occasions. On four occasions he was found there when the landowners went to collect rent? He was the one who answered the door correctly. Okay, and that's the limit of the evidence on that point, that he was there... Well, the limit of the evidence that could be shown from the records, yes, that the rent is part of the investigation. But from the records you can ascertain that he was there. That's the reason why standing was never questioned, I believe, by the prosecution in this case. They never made a question of Mr. Emilio having standing to request precisely the search warrant request. Okay. Where in the record is that? I believe the informant... I'm sorry to interrupt. The informant also, there is on the record that he said that Mr. Emilio was there also earlier with Mr. on the same date with Mr., and they were doing grocery shopping at that time for the house. Where in the record is this testimony that the owners went and asked Mr. Henirio for the rent at the premises searched? We'll have to look up on it, but it's part of the testimony from the agent. I believe it's Agent Allen. Thank you. It's Agent Allen's testimony, and it actually derives from the testimony that was on the suppression hearings, and I believe he's also March 31st also. I believe that was also discussed there also. I'm looking to see if I can see the page where it's Mr. Allen's testimony, specifically Jason Allen. Thank you. Counsel, just a side note. Counsel, do you want to reserve time for a rebuttal? Yes, I want to reserve time for the rebuttal. I'm sorry I have not initiated my earlier argument with that. I do wish to reserve that time for rebuttal. How many minutes of rebuttal would you like? Five minutes. Five minutes? That's granted. Yes, thank you. Counsel, can I ask you a general question as well? Sure. Do we need an opinion from the district court judge here to really decide the issues in this case, or can we go based on the record as it stands? Yes, I think that the record, at least our record, since we didn't go to trial, the records that we have of the suppression hearings and of the investigation clearly point out to the fact that we have an issue in our brief. But I wouldn't mind if, by an opinion of the district court, you could have further access to the evidence. They qualified and went to trial in this case and was acquitted. I think it would shed some light to this, but mostly what we are arguing about can be drawn from the transcripts. I think the whole transcripts of the suppression hearings are there, so I think they could be heard from that. But the truth shall come out, so I wouldn't be objective to an opinion from the district court to shed some light into this. Counsel, in your supplemental letter that we received, you make a statement that the informant had no key to the premises, yet the affidavit in support of the search warrant itself said he had a key. Yes, that is alleged that he had a key, but you see in the evidence that was purported to all co-defendants, no key was ever produced or shown. But it was really irrational for somebody that was never to leave the property nor allow anybody to have a key to the property. Counsel, I'm asking you specifically, though, about the affidavit. The affidavit said he had a key. The affidavit said that, and we question that, yes. It says that he had a key, and then he entered with a key. Nonetheless, he was ordered, maybe even from the agent, he was ordered not to leave or not to let anybody in. And we were later entertained by Mr. Mejia that he didn't have a key to the house. But nonetheless, even if in Arduendo he had a key to the premises, we cannot forsake the fact that the agents knew that he did not live there, that he was invited to stay there to help allegedly to have a hired hand. So even if he had a key, if he would have had a key, he did not have authority to let anybody in, as it was known to them. But not only that, that authority could not be construed to go into a room, let alone go into a closet, which was not just even the space that the hired hand was to live in or report in or stay in or guard. So this is really important, and I believe this was discussed in U.S. Duncan, which is discussing the part about even roommates not allowing access to his brother's room even, because it's not his own, let alone a container, and in this case a closet. When they knew, he didn't even have authority to go out. And he went out, supposedly, and then they came back in, right? And although he said that agents were in when Mr. Penn, the only agent that said he went in and went in to take a photo, it specifically states that he was taken to the closet. Right, right. And they were all under a bed. We're familiar with the facts, Counsel. That he understood that there were two huge bags that they would have cocaine inside. Counsel? All these things were, to our opinion, things that they deal mostly with, if he actually would have had authority to let people in his place, no, he had no authority. Actually, he was countermanded to that. He was there so as to not let anybody in. So he had the authority not to. He was ordered not to. But even if he had a window, he actually had a key, which we understand and hope that they did not have a key. No one was reported in evidence ever. This is the same person that tried to make out with four kilos when he was intervened. And this is in their own testimony by the agents as well from the suppression hearings. He tried to make out with kilos saying that they were his medicine. And even that, that would not give him authority to go into other persons' rooms, let alone other people's closets within the room. Okay, Counsel, can you hear me now? Counsel? They were there properly, the agents. They would have seen the evidence at that time, which is saying it was close to noon. But then they went and established a surveillance at 5 p.m., started another surveillance after Mr. Penn, and around one or two hours later, the suspect showed, and then they tried to go in. And this time they didn't even go in to the residence until they knew they had a search warrant. How come this happened if the informant was already in the house at that time and they had to draw the informant out? Counsel, Jay Jordan has a question, Counsel. Why then did they need a search warrant at that time when the informant was inside the house at the time they tried to make the arrest? At another time when they entered the property illegally, there was nobody else but the informant. The informant drawed them in, and he was already in the house the second time they performed the search warrant. But why did they wait until then? Why would they need a search warrant if they had already been in there and the informant was there? Counsel, I'm afraid your time is up. Counsel, your time is up. Counsel, your time is up. Counsel, Counsel, I'm afraid I have to cut you off. Counsel, your time is finished. This is technology in operation. Counsel? Counsel, Counsel, Counsel, Counsel, Counsel, your time is up. I'm sorry, I'm not hearing you. Your time is up, Counsel. I'm sorry, I'm sorry. Thank you for the opportunity. Okay. Take a breath there, will you? Because we were trying to ask questions and all, and you just kept going. I know that the phones may not be terrific, but we wanted to move things along as well. But thank you. Thank you for your argument. We'll hear from the government now. Thank you for the opportunity to make the most of it. May it please the Court, good morning. Good morning. Good morning. Everett Potter on behalf of the United States. Your Honor, this case is really about, at least the meat of this case, is really about a bad guy to the defendants in this case who trusted another bad guy to secure a residence that was used as a drug house. Right. And we're well familiar with the facts, and so let's just get to a couple of significant questions. What could, if the government actually believed that the confidential informant had the authority to let them in to look around, what explanation can there be for the decision to get a search warrant after having gone into the property already and looked around? What rationale could there be, if it's true that there was authority to let the police in, for after the fact, having breached the threshold of the home and searched it, to then go and say, give us a search warrant for the search we already undertook? Well, I think that the agents, out of an abundance of caution, went and secured the search warrant. Could they have, once they were lawfully entered, lawfully admitted into the residence, having seen the drugs, could they have lawfully seized the drug at that time? I believe that they could have. They did not in this case, and I think they did not because maybe in their minds, they weren't 100 percent certain that they could, in fact, do that. Doesn't it indicate an understanding on their part that they needed the authority of the court to go in and conduct a search? I don't know that we can draw that conclusion that they thought that, like, they were 100 percent certain that they needed a search warrant. I know that they knew that they had secured the residence, and that once they had secured the residence, I believe that it was safe on their part to say, let us go and get a search warrant, knowing what is now contained in the residence. So they feel that they had established PC probable cause at that point to go and search the residence. And that's what they did. They may very well have had probable cause. But from your documents, it appears that this was a past proven reliable confidential informer. At least that's the position the government seems to be taking, right? Correct. Okay. So you've got your confidential informant, past proven and reliable, inside the property telling you, hey, there's so much cocaine in here, you need a snowblower to get it out. And still, I mean, on that basis, I guess what I'm wondering is, what rationale could there be for walking into the property at that point instead of going and getting a search warrant? You had it. You had the information. You had it firsthand from a past proven reliable confidential informant. How do we excuse the failure to get a warrant at that point when there's an ample basis to get it? And evidently they thought they needed one because they got one later. Well, based on the confidential informant inviting them into the residence, again, the agents aren't attorneys. They aren't legal technicians. In their view of what they were attempting to do, they still felt that they had a legal duty to seek a search warrant. It could be that there was no such legal duty because the search was, in fact, already good and accomplished. But they felt the need to get the search warrant, which is what they did. I don't see any harm in them going that extra step in getting the warrant. Okay. You say in your letter brief to us that, and you rely on Fernandez versus California footnote, that, quote, an occupant, resident, and tenor are used to refer to the persons having common authority over the premises. That's a quote from your brief. Yes. Now, would you agree with me that the confidential informant was not a resident? I mean, you don't argue that he's a resident, and you don't argue that he's a tenant. Right. Right? The only argument you make in your letter brief is he's an occupant, right? He's an occupant. I know he's not a tenant. Now, is he a resident? I don't think that the facts at the suppression hearing were sufficiently flushed out to determine how long that apartment had been used as a drug house. Yeah, but you know the confidential informant's just there that day. He shows up that day. Yes. Right. So unless you're prepared to say he's a resident from the fact that he just showed up that day, he's not a resident either, is he? He's an occupant. Okay. So it requires your argument is pinned on our accepting that he's an occupant of those premises, right? Now, I guess I could accept that somebody is an occupant in the broadest sense of the word. I mean, I'm occupying space right now. I guess you could say I'm an occupant in that respect. But when the Supreme Court puts the word occupant, resident, and tenant together, doesn't it mean that the meaning of occupant should partake of the character of the words resident and tenant too? That is an occupant in the sense of somebody that's there, living there, belonging there, not just somebody that's using up space there. I wouldn't go that far. And I think what the court was attempting to say is that they didn't want to limit the characteristics of this person who is lawfully on the premises. So they use occupant, they use tenant, they use resident. But lawfully on the premises doesn't mean lawfully entitled to invite other people into the premises. Indeed, the one instruction we know from the record that this man was given was don't let anybody in, right? That doesn't mean don't let anybody in except the cops. It was don't let anybody in. That's the only thing we know about the instruction and entitlement given to the confidential informant. How does that translate into you've got full authority over this place. Go ahead and have anybody in you want, including the police. But I think he was in fact given full authority over the residence, over the apartment. He was given the authority to protect the house. That was his role. His role is to protect the house. His role is to use his best judgment to determine, in my view, who goes, who comes. So if you're making an agency argument, and it sounds like you are, how can it possibly be within his agency to do exactly what his principal told him not to do? The one instruction from the principal was don't let anybody in. Well, I think the principal, and I'm not making a principal argument, but he was told that his job is to guard the stash house. So how is it consistent to invite the police in at that point? Well, I think the person who hired the C.I. to guard the stash house and gave the C.I. access to the stash house, gave him full run of the stash house, if in fact it turns out that the C.I. lets the police in, I think that's a risk that the person who hired the C.I. took. Wasn't his authority limited then? He said don't let anybody in. Now you're saying, well, they let people in. Isn't that outside of the scope of authority if he's an agent? Well, again, I'm not arguing strictly agency law here. I'm just based on the facts of what happened in this case. Let me change direction just a slight bit. In the affidavit supporting the warrant, there was mention of a key. The C.I. had a key. Was that developed at all? Can you tell us anything else about this key, and what does it mean exactly? It was not developed at the suppression hearing. How should we weight that, the fact that he had a key? Well, the fact that he had the key, again, assumed that he was going to go and come. I think there may have been some argument that he was not supposed to leave the residence. If he was not supposed to leave the residence, then arguably he would not have a key for the residence. If he left the residence, I think whoever hired him is running the risk that he may bring somebody back to the residence. Was there anything else in the record? I couldn't find it, but exactly had he come to possess this key? The record doesn't have anything regarding how he came to possess the key. Okay. But, of course, the assumption can be made that the person who hired him, who told him this is what your duties are, gave him a key. And when he was given this responsibility, the person ran the risk that he may permit somebody into the residence that the other person with authority would not have wanted in the property. And that's exactly what happened in this case. Your adversary made reference to, he thinks, Agent Allen's testimony, suggesting that Diaz-Heniria was observed by the owner of the property as being present there and being inquired of paying rent. Is that your recollection of the record? I don't think that's in the record. I don't recall seeing that in the record. So kind of harkening back to what led to that inquiry, is there anything in the record, from your recollection of it, that would have demonstrated that Mr. Diaz-Heniria had a privacy interest in this location? Again, in reading the record, I did not find anything that showed that he had a privacy interest in the residence. And so if he had no privacy interest... Then he has no standing to challenge. And why wasn't that brought up before the district court? I don't know why that issue wasn't flushed out. Okay, thank you. At the district court level. Okay, thank you. Was there something that they can, well, they're right. Let me ask something about something you said in your answering brief. You said, at page 21, this court has stated, it will not review a district court's credibility determinations on appeal. And then later, on page 25, you say, here it is clear from the record that the district court considered the totality evidence, including defendant's own testimony, found the government's evidence more credible, et cetera. This was on the specific Moran issue. In fact, we have nothing from the district court in the way of findings, do we? No, we have no specific factual findings. Okay. So there is nothing for us to defer to, is there? I mean, we're in a posture where a ruling was made, but no rationale was given for the ruling and no findings were made, correct? No specific findings were made. However, under Rule 12 of the Federal Rules of Criminal Procedure, should we be sending this back to the district court and saying, hey, you've got to make findings, you've got to do what you have to do to put rationale and reasoning on the record? I think the record as it exists now is sufficient for this court to try to answer. But we don't make credibility determinations in the first instance. I mean, we're only reading a transcript. So isn't that difficult for us to do? Is that really what an appellate court ought to be doing? Well, I know that on the record the district court indicated that it would, in fact. Well, we know what the bottom line was. Didn't do that. But based on the decision of the district court, based on the fact that Mr. Henario, especially in this case, Mr. Henario testified at trial, sorry, at the suppression hearing and gave testimony that was contrary to the testimony of the agents, and based on the fact that the court ruled that it would not suppress the statements that he made and it would not suppress the discussion. Well, that's asking us to assume things, right? I mean, 12D says when factual issues are involved in deciding a motion, and there are clearly factual issues in this suppression motion, right? Yes. Okay. Then the court must state its essential findings on the record. That's what the rule requires. Why shouldn't we say politely to the district court, hey, you have to do this? It's not optional. That may be the best practice. But, again, on the record, if it was that Mr. Henario did not testify at the suppression hearing and there was some doubt as to what weight the judge gave the testimony of the agents, I can see maybe the need to send it back. But Mr. Henario testified. And if you read the transcript, it is clear that the judge did not give Mr. Henario's testimony any credibility. And for that reason, the decision was made to not grant his motion. I think that's sufficient. All right. Thank you, counsel. Thank you. Counsel, we'll hear from you. Now, granted, you only have a couple of minutes, so. I appreciate it. Wait, wait, counsel, wait. Wait, wait, counsel. Wait, counsel. Counsel. Counsel. This isn't going to work unless you take a breath, because we can't ask you a question then. Right. All right? So just keep it at a reasonable pace and try to listen when we want to interject. Judge Chigares, can I make a suggestion? Yes. Counsel, if I could ask, the judges are going to ask you questions. If you could answer the question, give us a minute so that we have a chance to each speak to you, and we'll give you a chance to respond. But Judge Jordan has been waiting to ask you a question since your first opening arguments. I'm going to turn it over to Judge Jordan. Right. And it's a very precise question. I want to note you said, I think, in response to something Judge Schwartz said earlier, that there is evidence in this suppression hearing record that Mr. DiIascenerio did not have a key to the property. Now, maybe you were just saying that there were inferences from evidence that would lead you to say that. But if there's actual testimony or evidence that he did not have a key, I would like you to identify that. Tell us whether there is evidence of that. No, Your Honor. I believe that the fact that he did not have a key doesn't arise from testimony, just for the fact that no key was ever reported in evidence. And that arises out of an interview I did with Mr. Mejia himself, but that does not show from the record that it was not discussed further. And no, when all evidence was produced, no key was ever produced to the house, even though they entered and obtained control of the house afterwards, that never a key was produced in evidence. And I thought it would be really important if it actually existed, that key, to prove maybe even that at least he could open a key. Okay.  Counsel, I did want to ask you a question. You raised other arguments in your brief, but didn't your client waive his right to appeal anything except suppression? Your Honor, yes, I believe he did that at that time, but after that he tried to withdraw his plea even before being sentenced. Yes, that's correct. But didn't he waive his right to challenge that as part of his plea agreement? I believe that to challenge the withdrawal of the plea after the plea, I don't think because if you're withdrawing your plea even before being sentenced, that means you're going to go to trial and not take your plea. Would you agree then? So the withdrawal of the plea itself could not be entertained to be intertwined with a confrontational plea. Would you agree he had to appeal that? Do you agree that he waived his speedy trial claim and his sentencing issue as a result of his waiver of his right to appeal, other than the suppression issues? Not the sentencing issue. Their sentencing was almost 50% more than the agreed upon time. Thank you, Counsel. And I believe that since they were so apart from it, that that activated his right to unappeal. Thank you, Counsel. And if I may, if I could, I wanted to respond to that. You have two minutes left, Counsel. If you want to, you could spend it. You can tell us whatever you'd like, but there's two minutes left. Okay. Thank you. Thank you. And please interrupt me if you must. I remember I can't see you. So as I see the public counsel's position about why did they want to get the search warrants, to be cautious? Cautious about what? Precisely. That is the gist of it. That is why. That is the essence of it. There were federal officers in the allegedly presence of plain evidence in plain sight in front of them, and they had their election informant who could testify as to everything he knew about that, why we didn't need to get away and go get a search warrant. They knew. Abundance of caution, please. It is even safer for them to seize all that evidence without any violence, without anybody being there to take control of the property and even prepare whatever they needed for later arrest if need came to be. That would have been cautious, but going and getting a search warrant seven hours later and an abundance of caution? I guess not. And it's precisely that I wanted to mention that there's no record and evidence that's saying that indeed this gentleman had a key. There's no record that who gave him a key or where he got this key from, which is also really important. Nowhere does it say that anybody gave him a key. What about the search warrant affidavit? It was in there, right? Yeah, in the search warrant affidavit it said that he had opened it with a key. Yeah, that was alleged, and we counted that, and no time was it ever mentioned how did he got this key or who gave him a key if he actually had one. Well, it's more than an allegation. It's in an affidavit, right? Yeah, go ahead. Well, it's more than just an allegation. It's in an affidavit, right? Can we give that some weight? Yes. Yes, it is in an affidavit, and I know it is, but that was one of the things that we had a really confrontation about, where was this key or who gave him this key, or where did he got this alleged key from, which we never saw and never entered into evidence either. And I think that one of the important things is that there were no accident circumstances that warranted the warrantless entry to the premises. Okay. Counsel, I'm afraid your time is up. I'm afraid your time is up, Counsel. I want to thank both Counsel for their arguments today. We'll take the case under advisement.